Good morning. May it please the Court, my name is Matthew Ferraro and I represent the Petitioner. I kindly request two minutes for rebuttal. This case comes to the Court in an unusual posture. The Petitioner's cat claim was screened out at a perfunctory reasonable fear proceeding before it was heard on the merits. Thus, the issue before the Court here boils down to this. Did substantial evidence support the IJ's finding that the Petitioner's credible, evidence-based fear of future torture was nothing more than frivolous? You're not arguing that there's something amiss with this new screening process for certain types of people? You're not arguing there's anything wrong with that or that it was improperly done? No, Your Honor, this is not a facial challenge. It's just the finding of the IJ that was consistent with the initial interview. That's right, Your Honor. The IJ concluded, as did the asylum officer, that there was no reasonable fear and that is incorrect. Yes. Clearly, substantial evidence did not support that finding. The Petitioner's fear of future torture was reasonable and the case should be remanded for a merits hearing. I'd like to make three points. First, the standard for establishing a reasonable fear is very low. Second, the Petitioner satisfied both the subjective and objective prongs of that low standard. And third, the IJ's failure to consider relevant evidence provides an independent ground for remand. So I'll take those in order. First, the standard, as I said, for reasonable fear is very low. All the Petitioner had to show was a reasonable possibility of future torture. Even a 10 percent chance, 10 percent, satisfies that low threshold. So the government doesn't actually seem to dispute, and I'll ask your opposing counsel about this, but this 10 percent number for this kind of proceeding seems to be agreed between the parties. But I had a little bit of trouble figuring out where that comes from here exactly.  Yes, Your Honor. So it's imported from the well-founded fear standard in the asylum cases, and that is a 10 percent standard. That would be Al-Harabi against INS, sets that as the 10 percent threshold. And I will say — And I saw that these regulations, like, refer to the asylum standard, but is it totally clear that they refer to the 10 percent aspect of the asylum standard? Yes, Your Honor. And I'll give you another case that actually was published after I finished our briefing and I'm happy to file a 28-J on it. It's Bartolome against Sessions. It's a Judge N.R. Smith opinion, and that explicitly says that the I.J. has to find that it's 10 percent, for example. And is that true, though, when we're talking about Catt versus asylum? Because I don't think it was Catt that was the point of the Judge Smith opinion, was it? Judge Smith was Catt, Your Honor, I believe. I have it here in front of me. But I — but to your point, it's clear from the cases that this 10 percent standard is imported to the Catt context, Martinez against Lynch, and the others that I cite in my briefs say that. And, again, Bartolome against Sessions says it quite clearly. I could find it if you want to talk about that one specifically. But, yes, no, I don't think that the 10 percent is disputed. I do think that it's imported over from the asylum context in the regulations, but it's clearly this 10 percent level. Well, we have a presumption that the I.J. did right. We have a presumption that the I.J. looked at everything that was before them, and then the I.J. made a decision that your client has not presented the evidence. And it's difficult for me to see how we can tip that over. The I.J. was just attempting to determine whether or not the initial agent was correct on his determination and made that decision. What is there that makes this case different? Your Honor, it's striking a number of things. It is striking that with so much before the I.J. he said so little. I mean, really, he said one word. He said speculative. That's the only – aside from reciting the standard, that's really the only thing the I.J. says. And I have to say I understand the point that we presume the government acts correctly, but of course for the review to be anything more than a nullity, we have to face the facts that in these circumstances where it's clear that he didn't consider the evidence, the I.J. didn't even engage with the central argument. You say he didn't consider the evidence and you went right on. Where do we find that in this record? I'll give you one example, Your Honor. So to recall, there was the I.J. hearing with the Petitioner. The Petitioner hands the I.J. evidence on country conditions. The I.J. takes the evidence without material comment, just as I take the evidence. Yes. The I.J. immediately issues his oral finding. Wait. Immediately isn't quite right. The person who is transcribing is only transcribing what is said. You're assuming there was not a long period of time between the statements. It could be equally that was occurring because the person who is taking it down is only recording statements made. Now, we have a presumption that binds us that the I.J. has looked at all of the evidence. You have to show that presumption is wrong and you're only doing that by assuming that the statement was made right after the material was held. But I don't see from the record that you can really overcome the presumption with that because it's equally true the I.J. didn't say anything while he was reviewing the record. Well, Your Honor, I think what's troubling here is the I.J. didn't say much of anything. I mean, we don't know if he did not engage with the central argument. That's right. That's why we presume that it is. And if there's something going on, the counsel will tell us in the record before the I.J. But aside from that, we don't guess what was going on. Well, Your Honor, just to correct, he was represented, he was not represented, he proceeded pro se. So he did not have counsel with him who could object.  And I would say that I think the Court's cases here are clear. Aguilera-Ramos v. Holder says the failure of the I.J. to consider evidence of country conditions contained in reports such as these is failure. Certainly that's true, but we presume, unless there's evidence to the contrary, that the I.J. did do that, that there's a presumption. So the I.J. says that Mr. Mendoza-Ortega's fears are speculative. They are not speculative. Mr. Mendoza-Ortega testified publicly. But he testified against enemies of the cartel. He didn't testify against the cartel. No, and isn't – I mean, if this is – if this meets the standard that you're arguing, doesn't it mean that anybody who has any connection, however remote, with the cartel is – satisfies this standard? No, Judge Edelman. Doesn't? No. First of all, in this circumstance, just to address specifically what you said, it's not known exactly the – who these people are against whom Mr. Mendoza-Ortega testified in court. There are seven individuals involved in a murder plot against him that resulted in the murder of Mr. Diaz, his friend. We, one, presumes, I suppose, that they're enemies of the cartel, but that's not in the record. That is the kind of thing. But they're not part of the cartel. We don't know that, sir. And I will say that Mr. Mendoza-Ortega is very clear that during the course of his contacts, of his testimony and his statements to the police, he testified about Hidalgo. So as I point out in the gray brief, it's true that he didn't testify against Juan Hidalgo, a cartel boss with power and trust. But he did testify about him. And I'll just say, I mean, Mr. Mendoza-Ortega tells the IJ clearly, I'm scared of going to Mexico because during the trial I gave out a lot of information. I mentioned names of people in Mexico, and I'm scared that they know what I've done. And he tells the asylum officer, I'm afraid that people will want to torture me because I gave names of people in Mexico. He said I gave out – I had to give out information and testify against all those people and who the drugs belonged to, that is to say, the cartel, because they didn't know that, and the person, presumably El Chiral, but we don't know, being in Mexico. So to your point, Your Honor, I don't think that there's a fear here that we're going to open the floodgates for every conceivable person to come in. In this circumstance, he testified credibly in three trials about the cartel, gave information that was adverse to the cartel. So I had a similar question. So it seems like he testified about Hidalgo, but can we figure out that it's about the cartel? I mean, do we have – Yes, Your Honor. He says he testified about El Chiral and the owners of the drugs. So then that's – and that means it has to be against the cartel? We can just extrapolate because they were in the cartel that it must have been? Is that – Again, I think this goes back to the standard – I mean, the evidentiary standard here. We're talking about 10 percent to get what we were saying before. And so, I mean, it's perfectly – it's objectively reasonable, right? That's the standard. Objectively reasonable to believe that when he says who will – the question is who will harm you in Mexico? El Chiral's people and the owners of the drug. I think El Chiral's people are the Knights Templar cartel. And I think to presume otherwise is to assume far too much, especially here where the evidentiary standard is so low. I'll still give you some time for rebuttal. We'll give you a minute and a half for rebuttal if you want to save the rest of your time, and we'll hear from the government. All right. Your Honor, I just wanted to say one very quick thing on the due process argument. Just to be very clear, this is not a reinstatement of removal case, and that was an error in the government's brief. I just wanted to say that on opening. Thank you very much. May it please the Court. My name is Jonathan Robbins, and I'm here on behalf of the Acting Attorney General. Good morning to everyone. As you just discussed with my colleague at length, the issue in this case is whether or not the record compels reversal of the immigration judge's determination that Petitioner did not establish a reasonable possibility of torture. Just at the outset, I just want to point out that Petitioner is not challenging the denial of withholding of removal, so we're only focused on the torture aspect of this case. To answer Judge Friedland's question regarding the 10 percent, the 10 percent isn't in any regulation. That's a creature of case law. The courts, in analyzing the well-founded fear standard, have said that that's a 10 percent threshold, and this Court has agreed with the Supreme Court on that front. And there is no dispute. The government does not dispute and agrees, in fact, that the standard in this case is akin to the well-founded fear standard that we normally see in asylum cases. But, of course, we're talking about the torture convention here, so this is a slightly different standard than we're normally dealing with in the torture context, because that standard is much more onerous in full removal proceedings. Right. Because usually it's 50 percent, but you're conceding that in this expedited proceeding, it's 10 percent likelihood of torture. That's exactly right. But Your Honors may be familiar, probably, with this standard, at least in the asylum context, and Your Honors know that claims that are speculative usually have a difficult time meeting even that well-founded fear standard. And that's really ultimately the problem with Petitioner's claim here, and that's what the immigration judge found was the problem, was that his claim was simply too speculative. Again, you know, if this was a situation where Petitioner had said – But why is it speculative for someone to think that if they testified against at least members of the cartel and connected them to the cartel, that the cartel might kill them when they get back to Mexico? Well, Your Honor, that fact pattern isn't quite what we have here, because as Judge Petitioner actually testified against the cartel. What he testified against were people who tried to rob the cartel. But in the process, he had to explain whose drugs they were, which was the cartel, and who was involved in the drug dealing, and that was the cartel. So it does seem like he's saying, I testified about the cartel's illegal activity. Well, a few things about what he stated to the asylum officer in that respect. He does say that he talked about his cousin, Juan Hidalgo, who was also arrested at the same time that he was. Now remember, his cousin was arrested at the same time as he was, so it doesn't seem like his discussion during any trial of the fact that these drugs belonged to his cousin had any effect on his cousin being arrested. His cousin appeared to have already been arrested. And he doesn't really provide any detail of giving any other information about anybody else in Mexico other than stating that he told the court that these drugs belonged to his cousin. So it doesn't seem like this is any information that was actually used against his cousin. If you actually take a look at the back and forth between the asylum officer and petitioner, there are numerous points in the record where they say, well, does your cousin, Juan, blame you for what happened? And he answers that no, his cousin doesn't blame him for what happened. They say, did you provide testimony against his cousin? He says no. Did you provide any sworn statements against your cousin? He says no. So this ---- But he says he did talk about what his cousin had been doing, right? I mean, it's not against his cousin, but he's still discussing his cousin in the other people's trial, right? Right. But in terms of whether or not the ultimate question here is, is the cartel going to have some sort of reasonable possibility of targeting him? And from the cartel's perspective, I mean, he was essentially selling cartel drugs. They were attacked. They were arrested. He served a bunch of time in prison. His cousin was also arrested at the same time before he could provide any testimony. So the question is, nobody from the cartel was flipped upon. He didn't testify against anybody from the cartel. So the question here is, is it a permissible view of the evidence for the immigration judge to say, this is too speculative to say that the cartel is going to come after you for this reason? I would also point out that when Petitioner was asked specifically about the individuals in Michoacan, he admitted that the individuals in Michoacan didn't know what he testified to at the trial. That's on page 170 on the record. They asked, do you think El Chorrol knows that you testified about Juan and the drugs? First he says, yes, I think he must know. But then he backed off and said, in Mexico, I don't know how they get the info. I think they know. I don't think they know what I said at the trial. So he doesn't suggest that anybody in Mexico knows what happened or is it true? And the question ultimately for the IJ is, is there any reason why they would want to go after him if nobody from the cartel has been either arrested or charged or prosecuted or anything of that nature? That's what makes this claim speculative. Now, at the end of the day, under the standard of review here, is does the record compel a contrary conclusion to that of the IJ? Given the fact that he's never been harmed, that he's never been called a snitch, that he's never testified against the cartel, that the claim is basically based completely on what we sort of generally know about cartels. We all know that cartels are awful. They commit atrocities. They often do manage to turn police and things of that nature. But is that alone enough when the claim is purely speculative? It's usually not enough, at least in the asylum context, when we're looking at the well-founded fear standard speculative claims. And this claim is just, I think it's reasonable for the IJ to have said that this claim is just simply too speculative to meet that initial threshold. With respect to the petitioner's argument in his brief regarding, he seems to have backed off that oral argument. But in his brief, he seems to be suggesting that this standard was not sufficient because the IJ's decision, I guess, was too streamlined, I suppose. That's sort of the accepted nature of these proceedings. We cite to Morales, Izquierdo and my colleagues cited actually to the more recent decision from September in Bartolome, in which this court has acknowledged that this is an appropriate screening process. I don't think there's any court of appeals in the country that has said that this isn't a valid process. So I don't think there's any merit to the argument that this was somehow, in fact, in this case, we've actually gotten more than we usually see because we have an actual oral decision by the immigration judge. Sometimes it's just that sheet with the checkbox. The distinction that petitioner has tried to make about this being not being a reinstatement case. And instead, this is a case under 238 because it expedited removal because petitioner is an aggravated felony. That's really a distinction without a difference. The reasonable fear process is the same in both of those. In fact, if you look at the worksheet in this case, there's a checkboxes on the worksheet. But in a reinstatement process, hasn't someone had an earlier process? This person, this is their only process. They may have, but it may have had nothing to do with cat. So for example, yes, it's true. Somebody may have been in a prior proceeding, but that doesn't mean that they necessarily had a prior withholding or cat claim, which would essentially be the rationale that they're trying to employ that somebody had gotten a previous chance at cat or withholding. That's not necessarily true in a reinstatement case. So it's really a distinction without a difference. I mean, it's clear that the regulations are the same for reasonable fear process for both. Is there any, I guess I haven't thought through this totally. So help me with this. Is there any reason they couldn't have had a cat claim in the earlier proceeding? If they did have a cat claim, I mean, unless something new happened in the country in the meantime, which isn't the sort of situation here. I mean, in any case, I mean, I suppose it's possible, but in this case, I don't think so because, well, it would depend on when the removal proceeding was, because if the events that lead, that give rise to a potential claim don't occur until, I mean, we're sort of talking. It's possible, right? That all of a sudden something changes in a country and now you have a risk of torture you didn't have before. But in general, in a reinstatement proceeding, there would have been an earlier opportunity to make a claim. And so I'm not sure it does transfer from one to the other that we can assume that the protections should be the same. Well, my point here is that the reasonable fear screening process, which is promulgated by regulation, is one in the same, right? There's no distinction in the regulations between the process. It's the same reasonable fear screening process. And they're, they've always been treated as being the same process. And it's in fact reflected in a lot of the documents, even in this case, where you can see that on the reasonable fear worksheet, there's a worksheet for the checkoff to say, this is either a 1231A5 or a 1221B, which is, that's reinstatement and the aggravated felony expedited removal rationales for a reasonable fear process. So they've never been treated differently. So the fact that this was prior, wasn't a reinstatement case really is a distinction without a difference. There's, at the, at the end of the day, this process has already been upheld by this court. It's, it's been upheld by every court that's addressed the issue. Let's see. Is there anything else I wanted to discuss? Do your honors have any questions about the case? Unless there are any further questions, I think I've said what needs to be said. I think there is substantial evidence in the record here to support the immigration judge's conclusions. And under the standard of review, the court should defer to the immigration judge in that regard. So thank you very much for your time. And to judges Friedland and judge Wallace, I will see you again tomorrow. Thank you. We'll see you tomorrow. Thank you, Your Honor. A few things to clean up. One, on Bartolome, it is 904 F3rd at 813. It says 10% in the, in the terror context. It seems like that petitioner, though, had an asylum, as I understand it, had an asylum claim and a cat claim. And the court kind of talks about them both. And we don't need to quibble about it. I'm not sure that it was really focused on the standard for cat, but they're not contesting it. So, yes, Your Honor. I must say on Morales' kudo, that is just incorrect. And I think you just read Morales' kudo, and it talks all about how, in that context, where a petitioner has gone through a previous lengthy removal process and has had all of the benefits of appearing before an IJ, a trier of fact, and all of that. In that context, more process is not necessary. Remember, Morales' kudo is about whether or not an AO can be the one who signs the reinstatement of removal orders. So I just think it speaks for itself. Briefly, on this notion of whether it's, whether El Sheral has to know that he was the one who testified against the cartel, I would just say that, A, he says that he believes that El Sheral knows. He believes that Rafael Hernandez will say that he does. But even if he doesn't know, even if he doesn't have proof of that, that's not dispositive. R. Gomez R. against Holder before this court granted a cat petition on credible testimony that the cartel would murder the petitioner if, underscoring if, they discovered that he had testified against them. Did he testify against the cartel? I just think, or given information about the cartel, we can look at the way the asylum officer summarized the testimony. He says, Mendoza Ortega divulged information regarding Juan and the drug cartel that they worked for. That's at AR-175. So I think that resolved that. And I just think that this notion that this is sort of a generalized or speculative harm really does disservice to the facts in this case because here he testified regularly three times about the cartel. He gave testimony that was adverse to the cartel. He testified credibly to those facts. And so we accept his statements as true. His father was extorted by the cartel with the help of the police that's at AR-181. When Mendoza Ortega was last in Mexico, he saw caravans of assassins caravaning without incident. He said that people were already being murdered with the assistance of law enforcement for testifying against the cartels in Mexico. That was pretty remote though, no, in time. That was pretty remote in time, no? Well, yes, Your Honor, but I think that has to fit into the fact that he doesn't have to show past persecution. And I go into that in some detail in my brief. I mean, this is all about future persecution. So of course, he hasn't been to Mexico for 16 years long before he became a target of the cartel. So he's not going to have that kind of information. He's been incarcerated for several years. And I don't think these courts have always relied upon reports and third-party evidence to establish things like country conditions. Thank you, counsel. And thank you for taking this case pro bono. We really appreciate your service to the court in doing that. My privilege. The next case on calendar is United States versus Haines. 17-10059. Each side in this case will have 15 minutes.
judges: Wallace, Friedland, Adelman